This is a somewhat unusual occurrence because we're having a joint oral argument on two separate appeals involving two co-defendants who were tried at the same time, both convicted and both filed an appeal with this court. It was thought by the panel that in the interest of judicial economy, it might be best to have the arguments from both defendants and the State in one hearing so that we can deal with essentially the same issue. So with that, I'd ask the lawyers for both defendants and for the State to approach the bench, identify themselves and the party that they are representing, and indicate to the court how much time they think they're going to use in advancing their argument. And I would ask that you consider in your time estimation the fact that we don't really need redundant arguments. If you can focus your time on something that hasn't been handled by the other attorney, that would be great, but if you feel it's necessary to thoroughly advance your position, we'll be happy to listen to you. Okay. Yes? My name is Ginger Odom from the Office of the State Appellate Defender for the appellate Duann Harris. Thank you. I'd like to reserve just two minutes for rebuttal. And how about, would you like to argue your position directly? Yes, sir. Sure. How much time would you like for that? I don't know. I've never been asked that. Just maybe ten minutes. All right. I'll put the stopwatch on you. Yes, ma'am? Good afternoon. My name is Rachel Kinstrand. I'm also from the Office of the State Appellate Defender, and I represent the appellant Dalyon Dixon. Based on my discussions with my co-counsel, my co-counsel will argue first, and because I have the statement in my case, I will argue after her. And then perhaps the state can go after her. Is that okay with you? Absolutely, Your Honor. So you can handle both arguments in your time slot? Yes, Your Honor. Okay. How much time would you like? I don't think I'll need more than ten minutes. I would like to reserve some time for rebuttal and suggest five minutes. I don't anticipate it will take that long. Okay. If it takes real long, we'll get the hook and do it, all right? Counsel, how much time do you need? Good afternoon. Assistant State's Attorney Eric Lee Blanton. Justice, I think 15 minutes will suffice. For everything? Yes. All right. Great. All right, Ms. Counsel for Harris first, right? Yes, sir. Okay. Ms. Odom. Good afternoon. May it please the Court. I represent the appellant, DeJuan Harris. In the brief, we argued that Mr. Harris' conviction for armed robbery with a bludgeon must be vacated or reduced to simple robbery where the State failed to prove beyond a reasonable doubt that Mr. Harris was armed with a bludgeon. The issue for this Court is whether it can rationally conclude that the object depicted in the video and described by Mr. Almazri as a gun was a bludgeon, where the object was not introduced at trial and the State presented no evidence as to its weight or composition. The answer is no. Here, the object has the appearance of a gun and was described by Mr. Almazri as a gun at trial. However, the Illinois Supreme Court in Ross and this Court in McBride have rejected the presumption that any object that has the outward appearance of a gun is dangerous. It is important to note that it's the State's burden to prove beyond a reasonable doubt that the object here was a bludgeon, and that burden never shifts to the defendant to prove that it was not. Illinois courts have laid out in Ross three ways for the State to prove dangerousness, that the item was operable and loaded, that the gun was actually used as a bludgeon, or that the gun's size, weight, and composition make it capable of being used as a bludgeon. The first two are not relevant because the gun was never recovered and was never used as a bludgeon, but rather the defendants held the gun down by their sides, pointed at the ground, and or placed in a pocket. That means weight and composition. That is, the State must prove that the object has sufficient weight and composition to inflict serious bodily injury. And this they did not do. There was no testimony on the point of weight or composition at trial. At trial, Mr. Almazri admitted that he did not see a gun when the men entered the store. Rather, after reviewing the video several times, he testified at trial and he saw the defendants in the video with a gun. He described the object simply as a gun with no additional description. And he was never close to the object because he had locked himself in his office before the men entered the store. The video shows only that the object was gun-shaped, not very large, and maybe was shiny. It may have been silver plastic or even a spray-painted water pistol with a metallic silvery paint. The DVD sheds no light on the item's weight or composition, its caliber or if it was loaded, and it was not brandished as a bludgeon. There was no evidence it could have been used as a bludgeon because of its physical characteristics. Based on the evidence from trial, this court cannot determine the weight or composition of the object and thus it cannot determine whether the object was capable of being used as a bludgeon. Accordingly, we ask this court to vacate Mr. Harris' conviction for armed robbery or reduce the conviction to simple robbery and remand for resentencing. Thank you. Now your argument is based primarily on the video, is that correct? Yes, Your Honor. And on the lack of testimony from Mr. El-Masri describing the item. And it's your position that we cannot determine weight or composition by looking at that video? That's correct. Would you please put the video on the monitor so that we can see it? Are you asking me? No, it's being done. You see it right there. Yes, sir. So that's the object we're talking about? Yes, sir. That's it? Yes, sir. That is a gun-shaped object. We cannot determine its weight or composition from the image on the screen. You said it appears to be silver in color. That is what the trial court determined, that it looked shiny and that it was metallic in nature. What were the trial court's findings based on? The appearance of the item in, I'm not sure. You looked at the video? Yes, sir. It was from the video? Right, right. Is this court bound by the findings of the trial court? No, sir. Why is that? Because this court is not in a superior position to view the trial court was not in a superior position  This court in Shaw just a couple months ago determined that the trial court does not occupy a position superior to the appellate courts in evaluating evidence that is not live testimony. In Shaw, they reviewed a DVD CTA video and they held that the reviewing court gives less deference to a trial court's determinations of fact when they are based on evidence other than live witness testimony. So we're essentially looking at the same thing the trial court was looking at. Exactly. And he's in no better position than we are to evaluate that video and determine whether or not that gun is metallic or if it could be used as a bludgeon, if it was heavy enough to be used as a bludgeon. Is that your position? Yes, sir. Would you say that the law then would require that you have some kind of ability to determine the weight? Do what now? That the law would require that we have an ability to determine the weight of the object? The only way to do that is to have the object recovered. Well, that's not necessarily so, your honor. In Malone, the court listened to the victim's testimony and the victim testified that she was in Walgreens, she was a clerk in Walgreens, and the item hit the counter with a loud thud and the court determined that a loud thud-like sound when the gun hit the counter was sufficient to determine that it had a heavy weight and could have been used in that manner. So there are other instances. May I hear that the gun was dropped? We have no sound. In my co-defendant's statement, which was not admitted against Mr. Harris, he did say that the gun dropped and fell apart. No, afterwards. Afterwards. And then they discarded it. I guess he was having trouble, I don't remember which of the defendants, but he was having trouble getting it out of his pocket, putting it in his pocket? That is the state's position, and that was Mr. Harris. The second part of the video, he's the second person to stand at the door holding the gun, and he does seem to have some difficulty manipulating it while he's holding a number of other objects in his hands, and also he's trying to put the gun in his pockets of his very low-sagging pants. Now the state cites that as evidence. The state is showing it was heavy. However, if you were able to view the third section of the video, you will see that after Mr. Harris cleared the counter the first time, he set down all the items in his hand, hoisted up his pants, which were low-sagging at that point before he ever touched the gun, then picked the items back up and walked back over to the door, where again his pants continued to sag. I mean, it was more of a fashion, it was his fashion decision and not the weight of the gun that pulled down his pants. They were just simply too large to stay up when he's jumping over a counter. So this fashionable defendant in the midst of this event, you keep referring to the gun. You're just not conceding it's a gun, are you? No, sir. It's a gun-shaped object. It's much easier to call it a gun than to call it a gun-shaped object, and that's exactly what Mr. Almazry called it. And even still, under Ross, an item having the outward appearance of a gun does not necessarily mean that it's dangerous. Right. Just so we're clear, you're not conceding that it was a gun? No, sir. Okay. Now you say that… I said I'm not conceding that it was a firearm. Pardon me for interrupting. Okay. I'm not conceding that it was a firearm, so it's clear. But you take the position that it appeared to be a gun. Yes, Your Honor. Right. Now you cited Shaw. Do you happen to have that site? Anthony Shaw. Yes, sir. It's not in your brief, I don't think. No, sir. It was decided in September. Would you like that site? Please. I don't have it. Anthony Shaw, 1st District, September 17, 2015, I think was the date of that. Okay. I can get it for you. Well, that's okay. We can get it. We'll find it. I think you know it. Don't be so sure. Well, I think Justice Hyman wrote that opinion, so… Oh, well, he'd know. I'm pretty sure he'll know it. Okay. Are there no other questions? No. Thank you very much. Thank you. Ms. Kinstrand? Thank you, Your Honor. The site for Anthony Shaw is 2015, Ill App, 1st, 123-157, and it was issued on September 17, 2015. Thank you. To the extent that I need to, I would adopt the arguments of my co-counsel in furtherance of my client's position. Your Honor, Justice Neuville is absolutely correct. You can look at this DVD without deference because the trial court was not in a superior position to view it. And the basis for the court's findings were, frankly, a little bit convoluted. The first part of his findings, he argued that the state had shown that this was a gun. But he did so after directing out all the counts related to the gun. And one of the points that I made on Dixon's behalf in the brief is that armed robbery with a bludgeon is not a lesser-included offense of armed robbery with a firearm. There are 15 cases decided by the appellate courts holding that position. And so the curious thing about this is I don't think it's a basis for finding that the conviction should be upheld because the court feels that the state presented evidence of a handgun. Because ultimately those counts were directed out and the only issue in this case is whether or not they proved the item was a bludgeon. And I think the basis for the bludgeon was that it was metallic in nature and that it was manipulated in a way that it could be used as a bludgeon. And I think if you look at the DVD, particularly with respect to my co-counsel's client, you'll see at one point that he's able to put that item in his front pocket. And I think it's a fair inference that he's careless about it. And I think that undercuts any inference that the object is heavy enough to be used as a gun or to be used as a bludgeon. But wouldn't that mean that maybe it doesn't have any bullets? It could still be a gun, but not have bullets. It could be, but certainly there's no evidence that the gun was operable or loaded in this case. To be a bludgeon, it doesn't have to be. Excuse me? To be a bludgeon, it doesn't have to be. No, it doesn't have to be loaded, but you have to have evidence of the size, weight, or composition of the item such that it could be used as a bludgeon. Well, as to the size, by looking at the video, the judge was able to approximate, say, the size based upon the hand around the grip of the gun. In fact, I think, if I recall correctly, he found it to be large inside. You know, I don't think it's particularly large. And I think when you see Harris put it in his front jeans pocket, I think that belies the inference that it's large. But certainly, I mean, I don't think, and certainly to go on to the point that I really wanted to argue here, you know, my client gave an inculpatory statement, which the state introduced into evidence in this case, in which he said it was a BB gun and that it broke when it dropped and that it was thrown away in the trash. And I think, certainly, there's nothing inherently improbable about what my client said in that statement that would somehow support that the item was heavy enough to be used as a bludgeon. Was there any evidence in the case contrary to the client's statement that it was a BB gun that broke? I mean, was there anything that could show that couldn't be correct? Was there any evidence other than that statement? I mean, was there any contrary evidence to the statement? Well, the state brought the statement in. I mean, they didn't contradict it. There's nothing to contradict it. I mean, I don't think looking at that DVD, you can say it's inherently improbable that that item is not a BB gun. But a BB gun can be a bludgeon. It could be a bludgeon. Certainly in Thorn, the court found that it wasn't a bludgeon. So the fact that it's a BB gun doesn't answer the question. Yeah, it's not inherently a dangerous weapon. So you're saying what makes the difference is its weight? Its weight. And its characteristics? I mean, the fact that it's metallic, that goes to weight? Yeah, I mean, I think the finding is that it was metallic in nature, but certainly metal-plated plastic is pretty ubiquitous. And I think you just can't tell. I think you can't look at that and say it's metallic in nature, therefore it's metal. And certainly the fact that my client is saying he dropped it and it broke would belie the state's theory that this was somehow an object heavy enough to cause a serious injury. Well, is it basically your position, for example, that a metallic-looking squirt gun is not heavy enough to be a bludgeon? Absolutely. I mean, we don't know if that was just excluding your client's statement, which, by the way, the judge disregarded, right? I think the judge didn't consider it. I mean, I just think, as I say to Tomasello, I just think he didn't consider it in making his ruling, which I think was contrary to Tomasello. So how is this court supposed to look at Mr. Dixon's statement? Well, I think it's not inherently improbable that this was a BB gun. I think there is absolutely no evidence that the state presented as to weight. I think the fact that the BB gun, he dropped it and it broke suggests... So his statement was unrefuted, and it was proffered by the state. Right, and it's proffered by the state. And so I think the trial court should have considered it. And I think, you know, when you look at the video, when you look at the DVD, you can't tell, you just can't tell the item's weight. And you have, you actually have, I mean, I think that later on in the video where he's kind of carelessly sticking it in his front pocket, I just don't think that indicates that it's heavy enough to be used as a bludgeon. But we just, we flat out don't have any evidence of it. And I don't think anything in the manipulation of it suggests it's particularly heavy. And as far as the metallic nature, I also point out in Skelton, you know, it was a four and a half inch BB gun or toy gun, but it had a tinny metal cylinder on it. So even if it had some metallic properties, that doesn't automatically equate to it being heavy. Well, the judge seemed to indicate that the owner of the store provided sufficient evidence for him to conclude that it could have been used as a bludgeon. What do you say about his finding? I think the owner of the store just, I think he just was not in any kind of a position to see the gun. I mean, we have the benefit of looking at it from the profile view, but Mr. Almazri was locked in the office on the left side. And so he's not seeing what we're seeing. He's seeing it from the front view. And if you look, if you rewind this and go a little bit back, you'll see that, I mean, he's not, it's not like Dixon is holding the gun up to the window and showing it to him. The other thing I would point out is one of the officers testified that initially Almazri didn't even know if there was a gun used in the robbery, but that after he watched the DVD, which would make sense, he believed there was a gun. Was there any evidence that the gun was used or branched as a bludgeon? Absolutely none. I mean, it just wasn't, it wasn't used in any manner. There's no, I mean, I don't think you can reasonably infer that that could do serious harm to somebody, particularly in the absence of any evidence of weight. Now, the charging instrument was two counts, correct? The charging instrument was four counts. One count of armed robbery with a firearm. That was directed out. That was directed out. The second count, which is the one we're talking about today, was armed robbery, and then it was armed robbery with a BB gun, and then it was amended to say armed robbery with a bludgeon. The BB gun was scratched out. And then I believe there were two subsequent counts of either unlawful restraint or aggravated unlawful restraint, and one of the aggravated unlawful restraint counts alleged that he used a BB gun. So in any event, no matter what he had in his hand, the State had to prove beyond a reasonable doubt that it was a bludgeon. Correct. And your contention is that whatever he had in his hand, in order for it to be a bludgeon, you have to establish beyond a reasonable doubt the composition of the object, because a squirt gun may look like a gun, but wouldn't be a bludgeon by ordinary evaluation because of its weight and its class, basically. Correct. And, you know, particularly when you're charging a class X felony, I mean, the sentence for bludgeon is 6 to 30 years. And then, again, I would go back to the point that I made at the beginning. You know, it seems like in light of the 15 cases that I mentioned, 10 of which are unpublished, but 5 of which are unpublished, it seems like the position is the default, if you're not going to find him guilty of armed robbery with a firearm, is to find him guilty of armed robbery with a bludgeon. And even in Washington, the Illinois Supreme Court acknowledged that armed robbery with a bludgeon is a distinct offense. So you have to put in evidence of the size, composition, and weight of the object you're contending is a bludgeon. And that's when we fear otherwise the remedy is to reduce it to robbery. Are there any further questions? Thank you very much. Thank you. May it please the Court, my name is Assistant State Attorney Eric Lieblad. I represent the people of the State of Illinois. Your Honors, the defendants DeLeon Dixon and DeJuan Harris were both properly convicted of the armed robbery with a dangerous weapon of the victim, Abdel Hamasar. The people presented the credible testimony of the victim in this case who testified through an interpreter that he was at his store on that morning the crime happened, and he observed the defendants peering through the window, which caused him to be suspicious. He then secreted himself into his office, and he testified that his office was elevated so he could observe the events that were going on in the store. And he testified that he observed the defendants, first Dixon holding the gun and then Harris holding the gun. When they came through that door, Dixon had that gun up in the air. Didn't Sergeant Hagan testify that Mr. O'Donarcy told him that he was not sure that he actually saw a weapon? That was before the video. Not sure. The victim was confronted with that testimony on the stand, on cross-examination by public defender Lakshmi Jha, and also again with Paul Christensen. And he said that, worse the effect, he may have been confused, but he definitely saw the gun when it was inside the store before he observed the video. He was allowed to explain that, and that impeachment was in front of the trial court during his trial testimony. Did the owner say anything about the size, weight, or composition? He did not, Your Honor. According to your opponents, that's critical to our determination as to whether or not he's guilty of armed robbery. Is it? Do you agree? Absolutely, I agree. Okay. So where do we find that evidence about the size, weight, and composition of the gun? Where is it? Your Honor, the victim in this case laid the foundation for the proper admission of the videotape, and he was able to narrate it while it was going on through the court. So your position is we can look at that videotape and determine size, weight, and composition? It's hand-in-hand. Yes. That's your position? It is. And, Judge, Justice, the court asked the question of the defense in this case, can't the court just view this videotape and come to its own conclusions? Yes, that's a critical question. And I understand that question. However, the defense is arguing de novo review on this, and that's not what is the appropriate standard of review in a case for sufficiency of evidence, Judge. As the court is well aware that with sufficiency of evidence, a reviewing court must determine after viewing the evidence in the light most favorable to the prosecution that any rational trier fact could come to that conclusion. And under this standard, the reviewing court does not retry the defendant, and the trier fact remains responsible for making determinations regarding the credibility of the witnesses, the weight to be given the testimony, and the reasonable inferences to be drawn for this evidence. Okay. Now, that traditionally deals with oral testimony. Absolutely. Because that's how you judge the credibility of a witness. Correct. Now, that witness could have said that was a machine gun in his hand, and, you know, it shot 50 bullets. Well. No, wait. He could have said that, which would be a credibility determination about, well, was it a 50-shot gun? Now, the judge looks at the video. The judge is looking at a video and is making a determination absent the testimony of a witness, correct? Because he's looking at a video. I disagree with the court. Okay. And I'll tell you that what is going on, actually what the court is proposing there, is that we would walk in a silent witness doctrine-type situation where we walk over, we lay the foundation that this video is able to be recorded, and it actually made an accurate recording. If we lay the foundation under silent witness doctrine, we can walk over and play it, push play. Right. But in this case, we had a hybrid presentation where we have a situation where the witness is testifying to what he saw from his perspective in that office at the time of the crime happening, and the videotape is played to corroborate what he saw from three other different perspectives. So it is not just the videotape, and that's why de novo review is absolutely inappropriate in this situation. We urge the court to view this videotape as many times as the court needs to view this videotape. But it is along the lines of it shows that the trial court's findings were absolutely reasonable in this case, and under the appropriate standard of review, it is a reasonable inference to be drawn by. It's not improbable, unreasonable, unsatisfactory. Under Roth, my understanding is that we are to look at the objective nature of the gun and not the subjective feelings of the victim, and what was the testimony you're talking about was the subjective feelings of the victim as opposed to the video. I have two parts to the answer to your question, Your Honor. First part, the videotape and the testimony of our witness is the evidence of the guilt of these defendants in this case. Secondly, in Roth, the Roths were the characterizations of the three types of weapons for dangerous weapons, whether it's loaded and capable of firing, per se dangerous, used in a dangerous way, or can be used in a dangerous way. The court in Roth said those were findings of fact. So again, we're back to the appropriate standard of review in this case, which is taking the evidence in the light most favorable to the prosecution, and that's how we need to view this. And also... Well, this video, correct me if I'm wrong, was the video used for purposes of identification of the defendants? Initially during the course of the investigation, Your Honor, it was. Well, how about during the course of the trial? Judges don't sit there and evaluate the investigation. Was the video used to identify the two people on trial as the perpetrators of the offense? Your Honor, the people used the testimony of the victim, and also the video. You can see clearly the faces of both offenders on this. Okay. And so it's both the evidence together. Your Honor, in response to some of the defense arguments in this case regarding the... We can tell the metallic nature of this firearm on this video. How do we do that? You can... How do we do that? You can look at it and tell. How can you tell from looking at it? Well, it's... You have it up there. Go over and show us. Okay. Please. Absolutely. There's other views of this video that we could also play, but in this particular photograph, this is appearing before the court, we see there's a silver and black firearm there, and you can tell by the way that he's manipulating this firearm while he is in this store. If you watch the handoff of this firearm between the two... Why don't we play that? I'd be happy to, Judge. Justice... Will you go on and run it, please? May I? Please move so that you can see. Would you like me to fast-forward to the handoff? Just run it. Let's look at it. That's okay. I want you to have a good view. When they get to the handoff, Your Honor, as you can see, you can see the shape, and also contrary to the defense argument where we're talking about low-sagging pants, the front part of this video, when Mr. Harris enters the store, he leaps the counter into the back where the cigarettes and the lottery tickets are, and that was an athletic move that no low-hanging pants is going to allow him to do. That is, again, circumstantial evidence. How these two gentlemen are manipulating this weapon, where they're standing in the stores, all circumstantial evidence that this is a, if not a true firearm, a bludgeon. Look at the handoff in this. Watch his pants. Let me ask you a question. Can you move back so I can... Let me ask you a question. Didn't the State proffer the statement of Mr. Dixon? Yes, Your Honor. Mr. Dixon testified about the size and weight and composition of that weapon, didn't he? He said it was a BB gun. I'm just asking you a question. Didn't he testify about size, weight, and composition? He said, Your Honor, that it was a BB gun that broke when he dropped it, and they threw it away. Is there any evidence in the record that rebutts what Mr. Dixon said? It doesn't matter. I didn't ask you. I said, is there evidence in the record that rebutts what he said? No, Your Honor. Is the court supposed to consider all the evidence? Absolutely. We don't consider Mr. Dixon's evidence, his statement. We just consider everything else but that statement. I believe the court considered his statement, and you can see that on page L7 of the record, where in the interplay between Mr. Dixon, it's September 23, 2013, when Mr. Dixon is sentenced, and that begins with, in response to Dixon's statement, he says, Dixon says, With all due respect, this is all. The trial court responded, I understand, but you've got to understand that the trial took you from 21 to 10. That's a long way. It's half of the sentence that you don't need to worry about, and you're fortunate that I only found you guilty of the BB gun. The man was hiding in the office when you went in there, was very frightened. This was a very serious offense, and even on this case, you could have been sentenced to 30 years in prison. I believe, based on that statement, that the trial court actually considered that if it was a BB gun. And in this case, it doesn't matter, because as you said in Thorne, in the opinion there, that a BB gun can be a dangerous weapon as long as there is some credible testimony as to the composition and how that was used. In Thorne, it was a hoodie with a hard object in it. That was the only testimony. Is Mr. Dixon's testimony credible? The state proffered it. What do we do with it? He says it was a BB gun. I dropped it, and it broke. The state proffered that evidence. If the court considered it to be a BB gun. The court did find it as a BB gun, yes, in what you just read. And real firearms break when people drop them. I mean, it doesn't matter. With real firearms, it can be used as a bludgeon. Sure. They break. Now you have two bludgeons, Judge, if you have certain compositions of this. It is absolutely appropriate. And in this situation, we've been urging the state's attorney's office to charge these cases in an appropriate way, which we did in this case. You know, as late as Spencer, in your case, and in Rule 23 that was released earlier this week, we charged this properly. There is a with firearm count and a with a dangerous weapon count in this case. And you can tell from the cases involving the very same trial court in Spencer, this trial court is concerned about the amount of time that a with firearm can get a defendant once he's convicted of that. And because of the statements that he's made over two different cases now, it's, you know, and we're back to whether or not it's a reasonable inference from the evidence that this was a metallic, heavy, and size of the object. I mean, the court's findings were, but of equal importance, when you look at the video, there's no mistaking that there is a weapon there. Stop right there. His findings were based on that video, right? Yes, sir. Not testimonial evidence. It's just as Pierce pointed out. Combination of both, Judge. He said based on the video. He just read it. Correct. Okay. Proceed. That there is a gun, it is quite a large gun, a handgun, and it's clearly visible on the videotape. When I compare that to the words that were said to the victim that secured himself in this office, when you can view what was happening, I find a very real threat of force as it relates to what was happening in that little store on the date and time in question. The other question is whether or not the defense attorney representing Mr. Dixon had to point out whether or not I could find the weapon as a BB gun. Whether or not that this could be a bludgeon, the court skips on, whether or not this could be a bludgeon, and based on its size and what I observed on the tape to be metallic in nature, and based on the way that it was manipulated in this event, it's very clear that it was a bludgeon to be used to strike anyone in the store and could have foiled the effort to rob the store and certainly was used in a manner to threaten the victim in this case, Mr. Dixon, who found himself in the office there. Those findings viewed in the evidence most favorable to the prosecution are not unreasonable, improbable, or unsatisfactory. How was it used or brandished as a bludgeon? When he came through the door, Mr. Dixon had the gun up in the air and said, don't move, don't move, and that was the testimony from the victim in this case, and that's why we can't just view the videotape like we could in a silent witness doctrine. It is both together, and that's how we need to view this. So holding the BB gun in the air. Well, and also where they've positioned themselves in the store. They're not back near the snacks. They're in the entranceway of the store, and they are positioning themselves that if somebody tried to come in the door, they could stop them using the weapon. It's the circumstantial evidence of how this weapon was used throughout this armed robbery. So is it your position that if there's a video, that whatever the judge in a bench trial sees in that video, we have to give the same deference to that finding as we would give to that judge's evaluation of a witness's credibility? Or we give it lesser deference than we give to the credibility determination? Same standard that you would use to a standard of review. So we give greater deference to the court's finding, the same deference we would give as to a court's credibility finding. Same deference. And defense counsel brought up Shaw. And in that case, Shaw is an armed robbery, or was charged as a robbery on the CTA. And in the court there, found the defendant guilty. And one of the things and one of the problems in the Shaw case was that the videotape didn't support some of the findings of the trial court in that position. So now we are into a situation of unreasonable and improbable and unsatisfactory. And so that is my understanding why this court reversed that case. Why couldn't this court do the same in viewing this video and say, we find that finding that it was a bludgeon, unreasonable and unsatisfactory, because we don't have anything else to consider with respect to its size, weight, and composition. See, that's the... In Shaw, there was impeachment, basically, with the video. Here, it corroborates. Isn't it a fact that the police officer impeaches... He's unaware that it's a gun until he views the video. Doesn't the police officer say that? The police officer does say that. And that's impeachment that's in front of the trial court. And the court says in that situation, in making his findings, that Mr. Amazor testified through an interpreter that this is not his first language. And considered the possibility whether or not this may have been a language issue. Thank you. If there's no further questions, Your Honors, I would ask that you affirm, for the reasons stated in our brief and during oral argument, that you affirm the defendant's conviction in this sentence. Thank you. I just have a couple points in rebuttal. In a few minutes, when we get to the third stage, I can show you the rebuttal to counsel's argument that the pants... You see he's jumping over the counter again. You can see that the crotch part of his pants is down near his knees. And he... And the third... I think this is the second part. The third part, again, lays down everything and hoists up his pants, which illustrates that his pants are low-sagging before he ever tries to put the gun in his pocket. Another correction about... A response to the standard of review. We are asking for de novo review because the state... The question here is whether the state has proven facts to establish a violation of a particular statute. That's a legal question subject to de novo review. We never challenged the credibility of Mr. Almazri. And all that Mr. Almazri offered to this court was his description of the item as a gun. Under Ross, that's simply not... You're challenging what the judge said. Do what now? You're challenging the judge's impressions of the video. That's exactly correct. And his... What counsel's saying, though, that we should give deference to that. I don't agree with that. I understand you don't agree. But on what basis? Do you have any case... Other than Shaw that you can... Shaw is the case that I would rely on to say that the video can be... That you're in the same position as the trial court. So you can look at the video. You don't have to defer to the trial court's findings that the item was heavy. And certainly it's not supported by the video. I mean, the men are manipulating this item with ease and fluidity. It's not apparently heavy. So there's no evidence of the weight of the item at all. The trial court's finding that it was metallic in nature. I mean, I would caution this court to remember, like Shakespeare said, all that glitters is not gold. Simply that it reflects light does not mean that it's metallic or that it's made of metal. Even if you're willing to have this inference that it's made of metal, you don't know what kind of metal. It could be made of tin or aluminum like the gun was in Skeleton. And so it's certainly not enough that it shines light off of it to determine that it's heavy. Again, I wanted to point out something that my co-counsel said. The position the state seems to be arguing is that the trial court directed out the firearm because of the add-on. The court was afraid of the add-on and didn't want to give these fellows an extremely long sentence. That's certainly not supported by the record here. The court does not make that inference. It doesn't make that explicit statement that he's trying to save the defendants from an additional long term of years. And even still, when the state charges a bludgeon, they still have to prove beyond a reasonable doubt that it was a bludgeon, and that is that it has weight and composition for it to be used as a bludgeon. A bludgeon is not just a fallback position when they fail to prove that it's an actual firearm. Thank you.  Ms. Kittstrom? I'll just try to touch on a few points not covered by my co-counsel. I do have a case for you. I have a case. It's People v. Rivera, and it's 409 ILAP 3D 122, and it's a 2011 case. Now, it was reversed by the Illinois Supreme Court on different grounds. But Rivera was also a completely different subject matter. It was a child pornography case, and it was a criminal sexual assault case. But in that case, part of the evidence recovered was video from the defendant's hard drive. And the state brought in evidence from a forensic examiner, somebody who was currently with the Secret Service at the time, and he looked at the tape and he testified. And it was a sex act between a girl that admittedly looked young and an adult male. And he testified, based on that video, that the girl was under the age of 13 to support the child pornography statute. And this court reversed it. And it looked at it with the same lens that we're looking at this videotape now. And it's saying we can't determine, based on that videotape, that the girl was 13. In the same manner, we can't determine the weight or composition of this item. And I will tell you that this was not at all cited in our briefs, but it was something that I happened to pull up during the course of preparing for arguments. So, you know, the state has not had the benefit of looking at that case. But, you know, in terms of the standard of review, credibility just isn't an issue in this case. I mean, as I pointed out in the beginning of the argument, Almazri can't see this item. Almazri provided no testimony as to the weight or composition. He can't see it. And he certainly, unlike several of the other cases, including Malone and Washington and even in Ross to some degree, the victim felt the gun. I mean, I think in Washington it was actually held up to the back of the head. And we don't have that in this case. So it's not a credibility issue. This court can rely on Shaw. And the Illinois Supreme Court case, I think it was Radojec, that it cited in Shaw. And the case I cited to you today. And you can look at this video and draw your own conclusion as to whether the state proved the bludgeon. Now, as far as what the judge said at sentencing, I don't think you can draw any conclusions that that was the basis of his ruling. Because ultimately he directed out all of the counts related to the firearm. So whether he was trying to save one, save him from a longer sentence, that certainly didn't come up in the court's ruling. And, in fact, it highlights the point that I made earlier, which was I don't think he considered this statement. And he was required to do that. It wasn't inherently improbable. So for these reasons, I'd ask this court to reverse his conviction, reduce it to robbery, and remand for resentencing. Thank you. On behalf of all the members of the court, we'd like to thank the attorneys for their fine briefing and argument of this interesting legal proposition. We will take this matter under advisement. And the court is now in recess.